### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOURNAL COMPANY, INC., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No: 3:05cv1027 (PCD) |
| | : | |
| MARKETING RESOURCE | : | |
| CONSULTANTS INC. and HARTFORD | : | |
| MAGAZINE LLC, | : | |
| Defendants. | : | |

### RULING ON MOTION FOR DEFAULT JUDGMENT, MOTION TO SET ASIDE ENTRY OF DEFAULT, AND MOTION FOR LEAVE TO FILE ANSWER OUT OF TIME

Plaintiff filed this trademark infringement action on June 27, 2005.  When Defendants failed to file an answer, Plaintiff filed its Motion for Entry of Default, and default was entered against Defendants on April 6, 2006.  One month later, Plaintiff filed its Motion for Default Judgment [Doc. No. 15].  Three weeks after this filing, Defendants appeared and filed a Memorandum in Opposition to Plaintiff's Motion for Default Judgment [Doc. No. 21], a Motion to Set Aside the Entry of Default [Doc. No. 36], and a Motion for Leave to File an Answer Out of Time [Doc. No. 37].  For the reasons stated herein, Plaintiff's Motion for Default Judgment [Doc. No. 15] is **denied**, Defendants' Motion to Set Aside the Entry of Default [Doc. No. 36] is **granted**, and Defendants' Motion for Leave to File an Answer Out of Time [Doc. No. 37] is **granted**.

### I.   BACKGROUND

Plaintiff, Journal Company, Inc., publishes CONNECTICUT MAGAZINE.[1]  This

---

[1] The title of the magazine is set in all caps.  Plaintiff used the actual typesets to distinguish its trademarks from Defendants, and the Court will do the same.

magazine focuses on broader political issues in Connecticut as well as issues appealing to certain

Connecticut residents, such as home decoration, gardening, and real estate.  As part of this

business, Plaintiff claims possession of several other trademarks including: CONNECTICUT

HOME & GARDEN (a regular column in the magazine), CONNECTICUT HOME (a regular

column in the magazine), BEST OF CONNECTICUT (an regular column in the magazine), and

THE MAGAZINE CONNECTICUT LIVES BY (a phrase used when soliciting advertisements).

Plaintiff has also maintained a website at www.connecticutmag.com since 1996.  Plaintiff filed

this suit claiming that Defendants were infringing these trademarks.

 Defendants have been preparing to start a new magazine in Connecticut.[2]  In early 2005,

Defendants began sending out advertisements for their soon-to-be published magazine

"CONNECTICUT home."  Defendants claimed that they diligently searched for similar

trademarks before selecting "CONNECTICUT home" and found none.  (Guinan Aff. ¶¶ 10-11.)

Plaintiff claims that it started using CONNECTICUT HOME as a column in its magazine in July

2004, but this new mark had not been officially registered as a trademark at the time that

Defendants began advertising their magazine.  Plaintiff also considers the title "CONNECTICUT

home" to be similar to CONNECTICUT HOME & GARDEN, another common feature in

Plaintiff's magazine.  Plaintiff argues that it is common practice in magazine publishing to

promote a column until it is popular enough to create a new magazine targeting the columns

readers.  Defendants marketed their new magazine with the slogans "DISCOVERING

---

[2]    Defendants contend that Defendant Marketing Resource Consultants should be the only Defendant
because Defendant Hartford Magazine LLC has been "inactive" for months.  Plaintiff showed that
Hartford Magazine is still registered as a legally active company.  Defendants stated that they will
move to strike Hartford Magazine LLC if this case continues; however, the Court will treat both
Defendants as active co-Defendants for the purpose of this ruling.

CONNECTICUTS BEST" and "THE MAGAZINE CONNECTICUT LIVES WITH," both of
which Plaintiff finds similar to its trademarks BEST OF CONNECTICUT and THE
MAGAZINE CONNECTICUT LIVES BY.  After discovering Defendants' advertisements in
May 2005, Plaintiff contacted Defendants and insisted that they stop referring to their magazine
as "CONNECTICUT home."  (Mims Aff. ¶ 22.)  Defendants never actually published a
magazine under this name.

        Defendants agreed to negotiate a settlement with Plaintiff, to cease using
"CONNECTICUT home" as the title for their magazine, and to avoid other infringements of
Plaintiff's marks.  (Mims Aff. ¶ 25.)  Although Defendants' intent to cease using
"CONNECTICUT home" seems genuine, they did not promptly cease several related activities.[3]
For example, Defendants had purchased the internet domain www.connecticuthomemag.com,
which remained in operation.  Plaintiff filed the Complaint with the Court on June 27, 2005.

        At this point, Plaintiff and Defendants continued to negotiate, and Plaintiff waited to
serve the Complaint and Summons.  It is clear from the parties' correspondence that negotiations
were promising, but never culminated in a signed settlement agreement.  Defendants were slow
to respond to messages sent by Plaintiff regarding settlement, and one or two issues were
consistently overlooked. (Mims Aff. ¶ 29; see also June 27, 2005 letter, Exh. 10 to Reilly Aff.
(complaining about a month delay); email correspondence, Exh. 13 to Reilly Aff. (repeated
requests for responses after delays).)  It apparently took several months for Defendants to remove
their internet domains, even though they had agreed to do so.  Plaintiff filed a motion in October

_____

        [3]        Defendant does not deny that some additional use of the similar marks continued, but claims that
        any additional infringement after June 2005 was unintentional.

3

requesting a sixty-day extension before the Complaint had to be served in order to continue to pursue settlement, and this Court granted the motion.

Two months later in December, with settlement still not complete, Plaintiff served the Summons and Complaint on Defendants, who do not deny being served.  A few days after service was perfected, Plaintiff requested that the discovery period be extended until April so that negotiations could continue.  Defendants claim that they thought this motion also extended the amount of time that they had to file an answer.  (Defs.' Opp'n to Pl.'s Mot. for Default J. 8.)

During negotiations, Defendants and Plaintiff agreed that Defendants could use the title "HOME LIVING *Connecticut*" for their new magazine.  (Email correspondence, Exh. 14 to Reilly Aff. (October 27, 2005 email).)  Defendants submitted this mark to Plaintiff, and received permission to use the mark.  This seems to confirm Defendants' belief that negotiations were progressing, but again, no settlement agreement was signed.  Defendant published its premier issue of the new quarterly "HOME LIVING *Connecticut*" in the winter of 2005.  The word "*Connecticut*" was smaller than the words "HOME LIVING" and was placed under the right side of the large HOME LIVING title.  (See Exh. I to Guinan Aff.)  It seemed at this point that the dispute had been largely resolved.  The date to file an answer passed on January 3, 2006; however, neither side took any action.

Defendant stated that it soon decided that the word "Connecticut" was too difficult to read on the new title.  (Guinan Aff. ¶ 39.)  For the next issue, the word "Connecticut" was changed to all caps and centered under the words "HOME LIVING," although the font size for HOME LIVING is still much larger that the font size for CONNECTICUT.  A copy of the new title was submitted to Plaintiff as a courtesy on March 1, 2006.  (Id. at ¶ 40.)  Plaintiff objected

4

that the new title of "HOME LIVING CONNECTICUT" had crossed the line and violated the understanding between the two parties.  (Id. at ¶ 41.)

On March 14, 2006, shortly after the new HOME LIVING CONNECTICUT issue had been produced, Plaintiff told Defendants to either accept the previously negotiated agreement— which was never signed—or to file an answer.  (Email correspondence, Exh. 3 to Reilly Aff.) Plaintiff told Defendants that it would move for a default judgement unless Defendants answered the Complaint by March 20, 2006.  (Id.)

At this point, Defendants apparently began to attempt to obtain litigation counsel. Defendants told Plaintiff on March 22, 2006—two days after the answer was due—that they would soon be obtaining counsel.  (Email correspondence, Ex. 5 to Reilly Aff.)  On April 5, 2006, with no answer having yet been filed, Plaintiff moved for the entry of Default against Defendants.  One month passed with no response from Defendants.  On May 4, 2006, Plaintiff moved for Default Judgment.  Three weeks later, on May 26, 2006, Defendants appeared, objected to Plaintiff's Motion for Default Judgment, moved to remove the entry of default, and asked for permission to file a late answer.

## II.    STANDARD OF REVIEW

There are three motions at issue here.  The first two, Defendants' Opposition to Plaintiff's Motion for Default Judgment and Defendants' Motion to Set Aside Entry of Default, are judged under the same legal standard.[4]  Under Fed. R. Civ. P. 55©), the question in both motions is whether there is "good cause" to set aside the default.  The Second Circuit used the following

---

[4]    Some courts have even considered the two motions to be interchangeable since they seek the same relief.  See Meehan v. Snow, 652 F.2d 274, 276 (2d Cir. 1981); 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2692, at 89 (3d Ed. 1998).

three factors to assess "good cause:" (1) whether the default was willful; (2) whether setting aside the default would prejudice the non-defaulting party; and (3) whether a meritorious defense has been presented.  See Meehan v. Snow, 652 F.2d 274, 276-77 (2d Cir. 1981) (using this standard in an appeal from a motion for default judgment); Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 96 (2d Cir. 1993) (using this standard in an appeal from a motion to set aside a default).  This standard is not as stringent as the standard applied when a party is seeking relief from a final default judgment.  See Fed. R. Civ. P. 60(b).

Generally, courts should construe "good cause" liberally when ruling on motions to avoid default judgments or to set aside the entry of default.  See Horn v. Intelectron Corp., 294 F.Supp. 1153, 1155 (S.D.N.Y. 1968) ("good cause" should be liberally construed even when applying the more strict Rule 60 standard).  The Second Circuit strongly prefers cases to be resolved on the merits, see Independent Productions Corp. v. Loews Inc., 283 F.2d 730, 733 (2d Cir. 1960) (describing default as a "drastic" remedy), and it has construed this three-part standard as a "lenient" one.  Meehan, 652 F.2d at 276.  Accordingly, district courts are instructed that doubts should be resolved in favor of the party seeking relief.  See Davis v. Musler, 713 F.2d 907, 915 (2d Cir. 1983).  Courts may, in equity, set aside a default, and, in doing so, may "impose a reasonable condition on the vacatur in order to avoid undue prejudice to the opposing party." See Powerserve Intern., Inc. v. Lavi, 239 F.3d 508, 515 (2d Cir. 2001); 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2700, at 169 (3d Ed. 1998).

Defendants also seek leave to file a late answer, as the time for filing an answer has passed.  Pursuant to Rule 6(b), the time allotted for filing an answer can be enlarged if there is a showing of "excusable neglect."  Fed. R. Civ. P. 6(b).  The phrase "excusable neglect" also

6

appears in Fed. R. Civ. P. 60(b) as a means of vacating a final default judgment and is considered to be a higher standard than the "good cause" standard.  See American Alliance Ins. Co., Ltd. v. Eagle Ins. Co., 92 F.3d 57, 59 (2d Cir. 1996).  There are four considerations when evaluating excusable neglect: (1) the danger of prejudice to the party in opposition; (2) the length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the party seeking the extension; and (4) whether the party seeking the extension acted in good faith.  See Pioneer Inv. Services Co. v. Brunswick Associates Ltd. Partnership, 507 U.S. 380, 395, 113 S. Ct. 1489, 1498, 123 L. Ed. 2d 74 (1993). "Excusable neglect" is not meant to be synonymous with "circumstances beyond the partys control."  Id. at 388, 113 S. Ct. at 1495.  Instead, the "excusable neglect" standard is meant to encompass inadvertence, mistake, or carelessness.  Id.

As stated previously, the standard for setting aside the entry of default pursuant to Rule 55 is less stringent than the standard for vacating a final judgment pursuant to Rule 60(b).  See Meehan, 652 F.2d at 276.  The situation is confused somewhat in this case, as Defendants have also moved to extend the time to file an answer pursuant to Rule 6(b).  The "excusable neglect" standard is more stringent, however, this Court deems it inappropriate to hold Defendants to the higher standard of excusable neglect merely because they invoked Rule 6(b).  See Walpex Trading Co. v. Yacimientos Petroliferos Fiscales Bolivianos, 109 F.R.D. 692, 695 (S.D.N.Y. 1986).  Accordingly, the decision of whether or not to grant Plaintiff's Motion for Default Judgment or to set aside the entry of default will be governed by the three-prong "good cause" standard set out in Meehan, 652 F.2d at 276-77.

## III.   DISCUSSION

**A.    Willfulness**

When negotiations broke down, Plaintiff specifically informed Defendants that they had

until March 20, 2006 to file an answer.[5]  After that date passed, Defendants notified Plaintiff that

they were working on retaining litigation counsel.  It took almost two more months before

Defendants appeared, during which time the Clerk entered a default against the Defendants and

Plaintiff moved to finalize the default judgment.  The fact that the non-defaulting party

encouraged the defaulting party to respond is a factor weighing against the defaulting party when

evaluating willfulness.  See Greco v. Reynolds, 416 F.2d 965 (3d Cir. 1969) (per curiam); United

States v. Wang, 130 F.R.D. 676, 678 (D. Kan. 1990).  At the least, failure to file an answer after

being specifically advised to do so suggests some degree of willfulness.  The Second  Circuit

held in S.E.C. v. McNulty, 137 F.3d 732, 739 (2d Cir. 1998), that a failure to answer is willful,

and even "egregious," when there were repeated warnings that the Plaintiff intended to seek entry

of default.  McNulty is distinguishable from this case, however, because it involved "multiple"

warnings and dealt with a motion filed after a final default judgment was entered, thereby

invoking the higher Fed. R. Civ. P. 60(b) standard.

Defendants ask the Court for leniency.  They state that they did not file an answer—or

apparently even prepare one—because settlement seemed imminent.  Defendants also suggests

that they erroneously thought the extension of the discovery deadline applied to their answer as

well as discovery filings.  Defendants, as companies who have apparently retained counsel

throughout this dispute, are sophisticated parties that should not be ignorant of their legal duties.

---

[5]    The Answer was due on January 3, 2006.  The March 20 deadline was set forth by Plaintiff when
settlement negotiations broke down on or around March 14, 2006.

This is especially true since Plaintiff specifically informed them that the deadline to answer the Complaint was approaching, a fact that Defendants then acknowledged.

It appears from the parties' correspondence that Defendants did not conduct themselves in a timely fashion throughout the negotiations. For example, Plaintiff complains that after making a settlement offer, Defendants would take weeks to respond with changes. (Mims Aff. ¶ 29; see also June 27, 2005 letter, Exh. 10 to Reilly Aff. (complaining about a month delay); email correspondence, Exh. 13 to Reilly Aff. (repeated requests for responses after delays).) This helps to explain why there was no binding settlement agreement in place months after the parties appeared to have an agreement in principle. Although Defendants apparently wanted to continue with settlement negotiations, they were slow to respond to many of Plaintiff's communications and requests. In this same manner, Defendants delayed filing an answer until almost six months after the actual deadline and two months after the parties' agreed-upon deadline. Plaintiff urges the Court to consider Defendants' actions "willful" in the sense that they were intentional actions. Although there is evidence in favor of Plaintiff on this point, the Court does not find that Defendants *planned* to default.[6] In fact, Defendants' failure to plan appears to be the entire problem. Therefore, while not condoning Defendants' conduct whatsoever, the Court does not find that the Defendants defaulted "willfully."

**B.   Prejudice**

Plaintiff argues that it would be prejudiced in its case because of the delay in time.

----

[6]   The dual meanings of willful, and the corresponding *mens rea* implications, have often been discussed. See e.g., Blacks Law Dictionary 1593 (7th ed. 1999). In the default judgment context, the Second Circuit has discussed at length what "willful" means in this circuit. See American Alliance Ins. Co., Ltd. v. Eagle Ins. Co., 92 F.3d 57, 59-60 (2d Cir. 1996). It was decided that "willful" did not include neglect or carelessness, in contrast to a situation where the litigant "deliberately cho[oses] not to appear." Id. at 60.

9

Plaintiff asserts that "[e]vidence, emails and other documents are often lost over the course of a year and memories tend to fade." (Pl.'s Reply to Defs.' Opp'n to Pl.'s Mot. for Default J. 4.) This is true, but Plaintiff merely points out a fact that accompanies the passage of time. Some delay is inevitable, and delay alone is insufficient to show prejudice. See New York v. Green, 420 F.3d 99, 110 (2d Cir. 2005). Plaintiff points to no specific evidence that has passed out of reach due to the delay of several months. This lawsuit appears to be largely based on advertisements and magazine publications which have been carefully documented by Plaintiff's legal team. The delay of several months should not prevent Plaintiff from adequately arguing its case against Defendants.

Plaintiff further asserts that it has been prejudiced by a loss of time, money, and the opportunity to conduct discovery. Plaintiff's Motion for Default Judgment is very thorough, and includes two affidavits and multiple exhibits. Plaintiff expended a significant amount of time on its Motion for Default Judgment and did not conduct discovery because Defendant appeared willing to settle. Because the Court has the equitable power to fashion terms and conditions that it deems to be just when granting a motion to withdraw an entry of judgment, Lavi, 239 F.3d at 515, it is held that the prejudice asserted by Plaintiff would be better handled through a remedy less drastic than default judgment.

**C.   Meritorious Defense**

There is little reason to reverse an entry of default if the outcome will not change. See In re Martin-Trigona, 763 F.2d 503, 505 n.2 (2d Cir. 1985). Therefore, Defendants must also demonstrate that they have a meritorious defense to Plaintiff's allegations. A meritorious defense weighs in favor of removing the default because the injustice of a default judgment is

10

heightened when the party has a defense to the claims.  See 10A C. Wright, A. Miller & M.

Kane, Federal Practice and Procedure § 2697, at 155 (3d Ed. 1998).  Defendants have filed a

proposed answer that will be filed with the Court if they are permitted to do so. (See Exh. to

Defs.' Mot. for Leave to File Ans.)  This answer denies almost all of the allegations in Plaintiff's

Complaint.

        The evidence necessary to show a meritorious defense varies widely by district; some

require only an allegation of a defense, some require facts supporting such an allegation, and

some require a showing of fact approaching a summary judgment standard.  10A C. Wright, A.

Miller & M. Kane, Federal Practice and Procedure § 2697, at 160-62 (3d Ed. 1998).  In the

Second Circuit, Defendants need not conclusively establish the validity of their defense.  Ferraro

v. Kuznetz, 131 F.R.D. 414, 419 (S.D.N.Y. 1990).  The asserted defense need only "have some

probability of success on the merits."  Robinson v. Bantam Books, Inc., 49 F.R.D. 139, 140

(S.D.N.Y. 1970).  The meritorious defense standard is measured against a low threshold of

adequacy for Rule 55 purposes.  Cf. Meehan v. Snow, 652 F.2d 274, 277 (2d Cir. 1981).  A

"superficial" presentation, however, is insufficient to demonstrate the existence of a meritorious

defense.  Marziliano v. Heckler, 728 F.2d 151, 156 (2d Cir. 1984).  Bald statements alleging that

Defendants possess a defense are insufficient; Defendants will have to present "some factual

basis for the supposedly meritorious defense" in order to satisfy this element.  Robinson, 49

F.R.D. at 140-41; S.E.C. v. Vogel, 49 F.R.D. 297, 299 (S.D.N.Y. 1969).

        In the eight-count Amended Complaint, Plaintiff alleges trademark infringement,

dilution, cyberpiracy, and unfair competition pursuant to the Lanham Act, 15 U.S.C. §§ 1051 et

seq., the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a et seq.,

and Connecticut common law.  Plaintiff claims that the advertising for Defendants' original

magazine, CONNECTICUT home, infringed on its marks.  Plaintiff argues that Defendants' new

title, HOME LIVING CONNECTICUT, also infringes on its marks.

       1.     <u>Count One: Unfair Competition Under the Lanham Act § 43(a), 15 U.S.C. § 1125(a)</u>

Plaintiff alleges that several of its marks were infringed, including CONNECTICUT

MAGAZINE and CONNECTICUT HOME & GARDEN.  At the time that Defendants began

advertising, Plaintiff's CONNECTICUT HOME column had not been registered as an official

trademark, but Plaintiff claims that it owns the rights to the mark CONNECTICUT HOME as

well.[7]

The Defendants argue that their use of "CONNECTICUT home" did not infringe on any

of Plaintiff's registered trademarks.  The mark that is obviously similar, Plaintiff's

CONNECTICUT HOME mark, was not registered as a trademark at the time that Defendants

began advertising.  Defendants argue that Plaintiff will have to show that it used the term

CONNECTICUT HOME so widely that Plaintiff has the right to its exclusive use.[8]  The Court

finds that Defendants have a colorable argument that either (1) their marks are not so similar as

to cause confusion, or (2) Plaintiff does not have the right to the exclusive use of its most similar

---

[7]     Plaintiff's Complaint alleges, in a number of instances, that Defendants encroached on its "CONNECTICUT marks" without specifying which Connecticut mark Plaintiff is referring to. Plaintiff states that it believes that Defendants' marks encroach on *all* of Plaintiff's Connecticut marks.  This assertion is more tenuous in the absence of the identification of a specific mark or marks.

[8]     Plaintiff responds by stating that "the allegations in the complaint are deemed true as a matter of law, including the validity of the Journal's CONNECTICUT Marks. . . ."  (Pl.'s Reply to Defs.' Opp'n to Pl.'s Mot. for Default J. 6.)  Plaintiff cites no authority in support of this, and the Court finds none.  Defendants can contest Plaintiff's assertions as long as they present facts supporting their defense.  <u>See Sony Corp. v. Elm State Electronics, Inc.</u>, 800 F.2d 317, 320-21 (2d Cir. 1986).

mark, "CONNECTICUT HOME."  Plaintiff correctly argues that the level of scrutiny should be heightened because the parties are competing in the same market, see RJR Foods, Inc. v. White Rock Corp., 201 U.S.P.Q. 578, aff'd, 603 F.2d 1058 (2d Cir. 1979).  Nevertheless, the Defendants have satisfied the low burden required at this stage.

Defendants additionally argue that even if their magazine title infringes on Plaintiff's marks, the magazine was never produced and placed "in commerce" as required under law. Plaintiff cites authority disputing this assertion, but since this Court has already found the existence of a meritorious defense to Count One, this argument need not be addressed at this time.

        2.      Count Two: Unfair Competition Under the Lanham Act § 32, 15 U.S.C. § 1114

Plaintiff's Complaint states that "Defendants' wrongful adoption and use of CONNECTICUT home and/or variants constitutes use of copies or colorable imitations of the Journals federally registered CONNECTICUT Marks, namely, CONNECTICUT MAGAZINE and is likely to cause confusion."  (Compl. ¶ 53.)  The allegation that CONNECTICUT home is so close to CONNECTICUT MAGAZINE as to cause confusion is denied by Defendants, and the Court agrees that there is a question of fact with regard to this issue.

        3.      Count Three: Trademark Cyberpiracy Under the Lanham Act § 43(d), 15 U.S.C. 1125(d)

Plaintiff's cyberpiracy claim is premised on the websites registered by Defendant. Plaintiff argues that Defendants' registration of connecticuthomemag.com and cthomemag.com are designed to confuse customers and allow Defendants to profit from Plaintiff's CONNECTICUT MAGAZINE mark.  Plaintiff contends that if customers go to Defendants'

websites believing that they belong to Plaintiff, then Plaintiff may lose business. Defendants

point out that the similarity must be shown to be in "bad faith," and deny having registered the

names in bad faith. Defendants argue that the websites were meant to advertise their own

"CONNECTICUT home" magazine, and not to misdirect Plaintiff's customers. The similarity

between Defendants' websites and Defendants' intended magazine "CONNECTICUT home" is

undeniable. Again, there is at least a question of fact with regard to the issue of "bad faith."[9]

> 4.    Count Four: Trademark Infringement Under Conn. Gen. Stat. § 365-11(i)(a)-(b)

Plaintiff's mark CONNECTICUT HOME & GARDEN is registered in the state of

Connecticut as a trademark, and Count Four simply repeats the infringement claim for this

particular mark. Defendants again deny that their magazine title "CONNECTICUT home" is so

similar as to cause confusion.

> 5.    Count Five: Dilution Under Conn. Gen. Stat. § 35-11i©

Plaintiff must show under this statute that their marks are "famous," such that another

partys "use of the mark . . . dilutes its value." Plaintiff's marks have been used to different

extents, and CONNECTICUT MAGAZINE is more likely to be "famous" than CONNECTICUT

HOME. Defendants again have a colorable argument that (1) they did not "use" Plaintiff's

marks, and (2) the marks were not "famous" even if they were "used."

> 6.    Count Six: Trademark Infringement under Connecticut Common Law

Plaintiff claims that its marks are famous, that Defendants have imitated these marks, and

---

[9]    Plaintiff also argues that since Defendant chose the title "CONNECTICUT home" without conducting a "meaningful trademark search" in order to discover the Plaintiff's CONNECTICUT HOME mark, this should be taken as evidence of bad faith. However, Plaintiff's CONNECTICUT HOME mark was not registered at the time.

that the imitation is so close as to cause confusion.  Defendants deny these allegations and refer to their earlier arguments.

    7. <u>Count Seven: Unfair Trade Practices Under CUTPA</u>

   Plaintiff's CUTPA claim is based on the deception supposedly evinced by the aforementioned infringements and cyberpiracy.  Plaintiff contends that Defendants engaged in deception by using marks similar to Plaintiff's marks.  Defendants deny any deception in the similarity of the marks and refer to their earlier arguments.

    8. <u>Count Eight: Unfair Competition under Connecticut Common Law</u>

   Plaintiff argues that Defendants "knowingly and willfully created the false impression that its sale of products . . . were affiliated or connected with" Plaintiff.  (Compl. ¶ 106.)  For the reasons already discussed, Defendants deny this charge.

    9. <u>Conclusion on Defendants' Assertion of a Meritorious Defense</u>

   Other than Plaintiff's CONNECTICUT HOME mark , Defendants have a realistic argument that their use of the title "CONNECTICUT home" was not confusingly similar to Plaintiff's marks.  As to CONNECTICUT HOME, Defendants argue that Plaintiff's use of this mark was not so widespread as to give it exclusive rights.  Additionally, Defendants argue that since they did not know that Plaintiff used CONNECTICUT HOME, they could not have willfully and knowingly infringed upon this mark as Plaintiff must show to prove at least some of its claims.  The Court finds that Defendants have met the minimal standard for establishing the existence of a meritorious defense.  Therefore, entering default judgment against Defendants would unjustly prevent Defendants from having a fact finder determine these issues.

  **D.**  **Remedy**

The Second Circuit has endorsed the "strong policies favoring the resolution of genuine disputes on their merits," In re Martin-Trigona, 763 F.2d 503, 505 (2d Cir. 1985), which weigh against upholding the entry of default in a case such as this.  Defendants have shown that default was not "willful" and have demonstrated a potentially meritorious defense to at least some of Plaintiff's claims.  Accordingly, the entry of default will be set aside and Defendants will be permitted to file an answer.

Plaintiff has demonstrated prejudice in the form of lost time, money, and discovery opportunities due to Defendants' carelessness in its defense of this suit.  The Court can grant Defendants' motion upon any terms and conditions that it deems to be just.  See Lavi, 239 F.3d at 515.  Accordingly, in an effort to lessen the prejudice to Plaintiff, the period for discovery shall be extended for sixty (60) days from the date of this Order.  Moreover, Defendants shall pay Plaintiff, within fourteen (14) days of the date of this Order, attorneys' fees of in the amount of $500.00 in order to compensate it for the loss of time and money caused by their delay. Defendants' answer, attached as an exhibit to their Motion for Leave to File an Answer Out of Time, shall be filed and docketed by the Clerk.   Defendants are admonished not to miss any future deadlines while defending this suit.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Default Judgment [Doc. No. 15] is **denied**, Defendants' Motion to Set Aside the Entry of Default [Doc. No. 36] is **granted**, and Defendants' Motion for Leave to File an Answer Out of Time [Doc. No. 37] is **granted**.

SO ORDERED.

16

Dated at New Haven, Connecticut, July  17 , 2006.

_____
/s/
_____
Peter C. Dorsey, U.S. District Judge
United States District Court

_____